**SO ORDERED.**

**SIGNED this 2nd day of May, 2025.**



_____
Mitchell L. Herren
United States Bankruptcy Judge

_____

**DESIGNATED FOR ONLINE PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

IN RE:

ARROWHEAD FINANCIAL ICT, LLC,

|                        | Case No. 22-10066 |
|                        | Chapter 7         |

Debtor.

DARCY D WILLIAMSON, Trustee,

Plaintiff,

vs.

**Adv. No. 23-5037**

AUCTION CREDIT
ENTERPRISES, LLC,

Defendant.

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff Darcy Williamson, Chapter 7 Trustee, filed a complaint against Defendant Auction Credit Enterprises, LLC, to avoid and recover alleged fraudulent transfers of money made by Debtor Arrowhead Financial ICT, LLC (dba Dale's Truck Sales) to Defendant pursuant to 11 U.S.C. §§ 548(a)(1)(A) (actual fraud) and (a)(1)(B) (constructive fraud).[1] The underlying basis for the complaint is an alleged embezzlement scheme perpetrated by one of Debtor's employees, Adam Newbrey. After the filing of an amended complaint and answer, Defendant filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), arguing Plaintiff's amended complaint should be dismissed because it fails to allege facts showing Debtor (1) had the intent to commit actual fraud in making the transfers, and (2) received less than reasonably equivalent value in exchange for the transfers.

The Court finds Plaintiff's amended complaint contains sufficient factual allegations to state plausible claims for relief. For the reasons discussed in this Order the Court denies Defendant's motion for judgment on the pleadings.

### I. Procedural History

Debtor operated a used car dealership in Wichita, Kansas from January 2021 to November 2021. After closing the dealership, Debtor filed for Chapter 11 relief.[2]

---

[1] Future statutory references are to the Bankruptcy Code, title 11, unless otherwise specified. Plaintiff is represented by Justin T. Balbierz and Mark J. Lazzo. Defendant is represented by Victor F. Weber.

[2] Case No. 22-10066, Doc. 1.

2

The United States Trustee subsequently filed a motion for dismissal or conversion of the Chapter 11 case under § 1112(b).[3] After holding an evidentiary hearing, the Court granted the UST's motion, finding that converting the case to one under Chapter 7 was in the best interests of creditors pursuant to § 1112(b).[4]

Now, Plaintiff, after filing an amended complaint, seeks to avoid sixteen transfers of funds from Debtor to Defendant in the aggregate amount of $147,815 for the repayment of floorplan loans[5] obtained by Debtor from Defendant.[6] Plaintiff argues the transfers are avoidable under § 548(a)(1)(A) because Debtor's employee, Newbrey, acting on Debtor's behalf, allegedly incurred the obligations and made the transfers with actual intent to hinder, delay, or defraud (i.e., actual fraud) (Count I) or, in the alternative, under § 548(a)(1)(B) as Debtor allegedly did not receive reasonably equivalent value for the transfers (i.e., constructive fraud) (Count II). Counts III (recovery of avoided transfers under § 550(a)) and IV (disallowance of claims under § 502(d)) are dependent on the success of Counts I and II.

---

[3] Case No. 22-10066, Doc. 34.

[4] Case No. 22-10066, Doc. 49.

[5] According to the National Automobile Dealers Association, a "floorplan loan" is a revolving line of credit used by car dealerships to purchase both new and used vehicles. The vehicles are then sold by the dealership to consumers or other dealers. The loans are secured by the respective vehicles and potentially other assets the dealer may have an interest in. Once the vehicles are sold, the dealer pays the lender and retains the proceeds. *Dealerships 101: What is Auto "Floor Plan" Lending*, National Automobile Dealers Association (Nov. 13, 2017), https://www.nada.org/nada/nada-headlines/dealerships-101-what-auto-floor-plan-lending.

[6] In her original complaint, Plaintiff also sought to avoid the sixteen transfers under § 547; however, Plaintiff removed the preferential transfer claim and re-ordered the remaining causes of action in the amended complaint (Doc. 7).

3

In its motion for judgment on the pleadings under Fed. R. Civ. P. 12(c),[7] Defendant argues Counts I and II of the amended complaint fail because Plaintiff failed to plead any fact that would tend to show Debtor had the intent to hinder, delay or defraud creditors and the transfers were made in payment of antecedent debts, making it impossible for them to be constructively fraudulent since they were, by definition, made for reasonably equivalent value. Because it claims Counts I and II are inadequate, Defendant also argues judgment should be entered for it on Counts III and IV.

## II.  Plaintiff's Allegations[8]

In the amended complaint Plaintiff alleges Adam Newbrey's used car dealership, iDeal Enterprises, LLC, had exhausted its available credit and, due to tax liens, was prevented from incurring additional capital.[9] Newbrey devised a scheme to obtain capital to continue operations at iDeal by persuading Dale Hybki, a family friend, to start his own used car dealership in which Newbrey, under the guise of providing assistance and guidance to Hybki, would obtain floorplan loans on behalf of Hybki's new entity and embezzle vehicles for iDeal.[10]

Hybki, who was twenty-three years old at the time, agreed to start the new dealership and formed Debtor in 2020, with Hybki as the sole member and

---

[7] Rule 12(c) is made applicable to adversary proceedings by Fed. R. Bankr. P. 7012(b).

[8] Although the Court accepts Plaintiff's factual allegations as true for purposes of a Rule 12(c) motion (as discussed below), these allegations do not constitute the Court's findings of fact for the ultimate resolution of the case.

[9] Doc. 7 ¶ 14.

[10] *Id.* ¶¶ 15, 16, 17.

4

manager.[11] Once formed, Debtor opened a business checking account with a local bank where all Debtor's business transactions were processed.[12]

In early 2021, Debtor opened and began operating the used car dealership, Dale's Truck Sales.[13] Newbrey was entrusted by Hybki, who had little experience in the industry, to assist him in handling Debtor's operation, finances, and perhaps most importantly, Debtor's floorplan loans.[14] Thus, Newbrey, on Debtor's behalf, obtained floorplan lines of credit from various lenders, including Defendant, to purchase used cars to sell on Debtor's lot.[15] According to Plaintiff, Newbrey's embezzlement began shortly after Debtor incurred its first floorplan loan.[16]

As alleged in the amended complaint, Newbrey's plan was multifaceted and, according to Plaintiff, operated like a Ponzi scheme in that, to keep it alive, Debtor, through Newbrey, needed to obtain more and more capital to pay an ever-increasing backlog of Debtor's floorplan loans for vehicles that were sold, not by Debtor, but by iDeal.[17] The basic scheme often involved moving vehicles purchased using floorplan loans obtained by Debtor from Debtor's lot to iDeal's lot, where iDeal would sell the vehicle and retain the proceeds.[18] Following the sale, Newbrey would access Debtor's online account with the floorplan lender and initiate an automated clearing

---

[11] *Id.* ¶¶ 17 n.1, 18, 19.

[12] *Id.* ¶¶ 20, 21.

[13] *Id.* ¶ 22. Plaintiff alleges Debtor's car dealership was a "relatively smaller operation" with less than fifteen vehicles for sale at a time. *Id.* ¶ 23.

[14] *Id.* ¶ 51.

[15] *Id.* ¶¶ 24, 30, 33, 36.

[16] *Id.* ¶¶ 24, 28.

[17] *Id.* ¶¶ 29, 39.

[18] *Id.* ¶ 42.

5

house payment from Debtor's checking account for the remaining balance of the floorplan loan.[19] Then, upon receiving payment, the lender would send the vehicle's title to Debtor and Newbrey would take possession of it.[20]

To continue the scheme, Plaintiff alleges Newbrey, acting on Debtor's behalf, employed various methods to generate revenue.[21] Plaintiff alleges that in some instances Debtor and iDeal (or another entity associated with or owned by Newbrey), at Newbrey's direction, would buy and sell floorplanned vehicles amongst themselves to obtain new loans from different lenders.[22] At other times Debtor, through Newbrey, obtained and later repaid floorplan loans on vehicles that had already been sold by iDeal, or obtained multiple floorplan loans from different lenders for the same vehicle.[23] Plaintiff further alleges that when Debtor would sell a floorplanned vehicle the proceeds were often paid to earlier lenders rather than the lender with a lien on the floorplanned vehicle.[24]

Ultimately, Plaintiff alleges Debtor purchased thirty-nine vehicles with floorplan loans issued by Defendant.[25] Of those thirty-nine vehicles, Plaintiff claims fifteen were misappropriated by Newbrey, who then sold the vehicles and retained the profits.[26] Plaintiff alleges that in the two years preceding Debtor's filing of

---

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶ 40.

[22] *Id.* ¶ 43.

[23] *Id.* ¶¶ 44, 45.

[24] *Id.* ¶ 46.

[25] *Id.* ¶ 48.

[26] *Id.* ¶ 48(c).

6

bankruptcy, Debtor made sixteen transfers from its bank account to Defendant in furtherance of Newbrey's embezzlement scheme.[27]

Plaintiff claims Hybki remained unaware of Newbrey's scheme until October 2021, when he noticed irregularities in the payments to floorplan lenders.[28] Hybki confronted Newbrey, and during that confrontation, Plaintiff alleges Newbrey confessed he had been using Debtor's floorplans and funds to obtain vehicles for iDeal.[29]

Hybki closed Debtor's checking account to prevent further embezzlement and, soon after, shut down Debtor's business.[30]

## III. Conclusions of Law

### a. Jurisdiction

This is a core proceeding to determine, avoid, or recover a fraudulent conveyance, which arises under title 11, over which this Court has subject matter jurisdiction.[31] Venue is proper in this District.[32]

---

[27] *Id.* ¶ 63. In paragraph 63, Plaintiff provides a chart of the relevant transfers, depicting the transfer date, transfer amount, floorplan date, vehicle, and the last six digits of the VIN. In the "Transfer Amount" column, there are five transfers that have notations after the listed amounts (e.g., the 08/02/21 transfer has an "A1" notation by the transfer amount), but those notations are not defined.

[28] *Id.* ¶ 55.

[29] *Id.* ¶ 56.

[30] *Id.* ¶¶ 57, 58.

[31] 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(H), and Amended Order of Reference, D. Kan. S.O. 13-1.

[32] 28 U.S.C. § 1409(a).

7

### b. Rule 12(c) Standard

Rule 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."[33] The standard for judgment on the pleadings under Rule 12(c) is the same standard used to assess dismissal under Rule 12(b)(6).[34]

To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[35] A claim is plausible when the plaintiff pleads sufficient facts that allow the court to draw a "reasonable inference that the defendant is liable for the misconduct alleged."[36] Determining whether a complaint states a plausible claim is a context-specific analysis that requires the Court to rely on its judicial experience and common sense.[37] The burden rests on the moving party (here Defendant) to show the "complaint does not state a plausible claim for relief."[38]

---

[33] Fed. R. Civ. P. 12(c). The timing of Defendant's motion for judgment on the pleadings is appropriate as the pleadings were "closed" on February 23, 2024, after Defendant filed its answer (Doc. 20), and a trial date has not been set by the Court.

[34] *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223 (10th Cir. 2009) (citing *Nelson v. State Farm Mut. Auto Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005)); *McVicker v. Ultimate LLC*, No. 24-2162, 2024 U.S. Dist. LEXIS 227823, at *2 (D. Kan. Dec. 16, 2024) (citing *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013)). Rule 12(b) provides a list of defenses that a party may assert in a motion, one of which, (b)(6) allows a party to assert that the complaint "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[35] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[36] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

[37] *Williamson v. Guardians of Travel, LLC (In re 1 Big Red LLC)*, No. 21-20044, Adv. No. 23-6002, 2023 Bankr. LEXIS 2902, at *10 (Bankr. D. Kan. Nov. 29, 2023) (citing *Iqbal*, 556 U.S. at 679).

[38] *Id.* at *9-10 (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed.)).

8

In analyzing whether Plaintiff's amended complaint states a plausible claim for relief, the Court must accept "'all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings' in that party's favor."[39] However, conclusory statements or a "formulaic recitation of the elements" are not entitled to the presumption of truth.[40] In ruling on a motion for judgment on the pleadings, the Court may consider the complaint, materials attached to the complaint, and the answer.[41]

### c. Rule 9(b) Heightened Pleading Standard

Because Plaintiff alleges fraud, she must comply with Fed. R. Civ. P. 9(b)'s heightened pleading standard: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[42] At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where, and how of the alleged fraud.[43]

---

[39] *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012) (citing *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006)).

[40] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

[41] *Ciber, Inc. v. ACE Am. Ins. Co.*, 261 F. Supp. 3d 1119, 1125 (D. Colo. 2017) (citing *Park Univ. Enters.*, 442 F.3d at 1244).

[42] Fed. R. Civ. P. 9(b), made applicable by Fed. R. Bankr. P. 7009.

[43] *Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) ("At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud.") (quoting *Williams v. WMX Tech. Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)). *See also Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) ("Simply stated, a complaint must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.") (citing *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991)); *Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1203 (D. Kan. 2001) ("In other words, the plaintiff must set out set out the "who, what, where, and when" of the alleged fraud.").

9

## IV.   <u>Analysis</u>

### a.  **Count I—Actual Fraud**

Section 548(a)(1)(A) provides in relevant part:

> The trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

Therefore, to state a claim under § 548(a)(1)(A), Plaintiff must allege particular facts showing (1) Debtor transferred an interest in property, (2) the transfer was made or incurred within two years of filing the bankruptcy petition, and (3) the transfer was done with the actual intent to hinder, delay, or defraud Debtor's creditors.[44]

Defendant's motion focuses on the latter requirement, arguing Plaintiff's amended complaint does not contain any facts showing Debtor had the actual intent to hinder, delay, or defraud its creditors because (1) although Plaintiff plead Newbrey acted with actual intent to defraud in embezzling funds and property from Debtor, Newbrey's actions and intentions cannot be attributed to Debtor since Newbrey was working against Debtor's interests, (2) Debtor did not operate a Ponzi scheme such that intent can be inferred or presumed because its business was not

---

[44] *Gould v. Liebl-Weaver (In re Darter)*, No. 23-11680-SAH, Adv. No. 23-01057-SAH, 2024 WL 5152577, at *14 (Bankr. W.D. Okla. Dec. 16, 2024) (citing cases). The requirement of showing actual intent to hinder, delay, or defraud is disjunctive; any one of the three showings is sufficient for § 548(a)(1)(A). *Collier on Bankruptcy* ¶ 548.04 (Richard Levin & Henry J. Sommer eds., 16th ed.).

10

illusory, and (3) none of the badges of fraud were sufficiently plead. The Court will address each in turn.

### 1. Imputing Intent

Determining whether an agent's fraudulent intent may be imputed to the principal is an issue governed by state law.[45] Under Kansas law, "a corporation is liable for the torts of its agents when committed within the scope of the agents' authority and course of employment, even though[] the corporation did not authorize or ratify the tortious acts."[46]

Broadly, there are two types of authority an agent may possess: actual authority and apparent authority. Actual authority may be express (e.g., through specific or detailed language) or implied (e.g., obligations stemming from the agent's express responsibilities), and is based on the agent's reasonable belief "in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."[47] Apparent authority, in contrast, is based on the third party's reasonable belief the agent has the authority to act on behalf of and bind the principal, which is traceable to the principal's manifestations.[48]

---

[45] *Sher v. JPMorgan Chase Funding (In re TMST, Inc.)*, 610 B.R. 807, 818 (Bankr. D. Md. 2019) (citing cases). The Restatement (Third) of Agency defines "agency" as the "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act." Restatement (Third) of Agency § 1.01 (2006); *see also Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 955, 335 P.3d 1178, 1188 (Kan. 2014) (quoting same).

[46] *Deere & Co. v. Se. Equip., Inc.*, No. 93-2005, 1994 WL 171449, at *3 (D. Kan. Apr. 26, 1994) (citing *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 989, 666 P.2d 711, 713 (Kan. 1983)).

[47] *Golden Rule Ins. Co.*, 300 Kan. at 956 (citing the Restatement (Third) of Agency § 2.01 (2005)).

[48] *Id.* (quoting the Restatement (Third) of Agency § 2.03).

11

In addition to having authority to act, the agent's actions must be within the scope of employment to be attributable to the entity. The Restatement (Third) of Agency provides:

> An employee *acts within* the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's *act is not within* the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.[49]

The bankruptcy court in *Sher v. JPMorgan Chase (In re TMST)* dealt with a similar procedural and substantive issue as the one presented here: whether the bankruptcy trustee's complaint alleged sufficient facts to show the fraudulent intent of a debtor's officer could be imputed to the debtors to form a basis for avoidance under § 548(a)(1)(A).[50] There, the creditor transferee argued the director's intent, regardless of whether it was fraudulent, could not be imputed to the debtors because a single officer's fraudulent intent in making the transfers could not be imputed to the debtors.[51] The court rejected the creditor's argument, holding the officer was an agent of the debtors who had actual authority to bind the debtors, and, under the traditional rules of agency law, the agent's intent could be imputed to the debtors.[52] Further, the court found the trustee had adequately pleaded facts

---

[49] Restatement (Third) of Agency § 7.07 cmt. b (2006) (emphasis added). As defined in the Restatement, an independent course of conduct "represents a departure from, not an escalation of, conduct involved in performing assigned work." *Id.*

[50] *In re TMST, Inc.*, 610 B.R. at 814–15.

[51] *Id.* at 817.

[52] *Id.* at 820–23.

12

to survive a motion to dismiss as it alleged the debtors, through their agent, made the transfers with the intent to hinder, delay, or defraud.[53] The court explained:

> [Section] 548(a)(1)(A) intent is established if the actor believes, appreciates, or knows with substantial certainty that creditors will be hindered, delayed, or defrauded as a natural consequence of the transfer, even if the actor's actual motive is not to hinder, delay, or defraud such creditors. Thus, an officer/transferor can harbor § 548(a)(1)(A) intent even if he was trying to salvage the debtor and benefit creditors.[54]

Here, Plaintiff's allegations are sufficient to meet the heightened pleading standard under Rule 9(b) and establish a plausible claim that Newbrey's actual intent could be imputed to Debtor. Plaintiff asserts particular facts showing Hybki, in relying on Newbrey to handle floorplan loans, gave Newbrey actual authority to bind Debtor in floorplan obligations and transfer funds related to those obligations, and Newbrey was acting within the scope of his employment with Debtor by incurring the floorplan loans and transferring the funds.

Still, Defendant argues Plaintiff alleges facts that are contrary to her position, namely the allegation that Newbrey "acted for his own benefit to the detriment of the Debtor,"[55] which it claims undermines Plaintiff's argument for imputing Newbrey's alleged intent to the Debtor as Newbrey was working against Debtor's interests. True, courts have not imputed the agent's intent to the principal if the agent was found to be acting *solely* for their own interests and not for those of

---

[53] *Id.* at 828.

[54] *Id.*

[55] Doc 7 ¶ 41.

13

the employer.[56] However, the amended complaint also alleges facts indicating Debtor indirectly benefited from Newbrey's actions. Plaintiff alleges Newbrey, to continue the scheme, had to ensure Debtor generated revenue to remain operational, which then lead to Newbrey, on Debtor's behalf, initiating numerous fraudulent transactions. Those transactions involved Debtor repaying prior lenders with proceeds of vehicle sales that should have been used to pay off other lenders or Debtor obtaining floorplan loans on vehicles already sold by iDeal, all in an effort to longer sustain Debtor's business and Newbrey's scheme. In any event, Fed. R. Civ. P. 8(d) permits pleading alternative or inconsistent claims and defenses, and the Court "will not, at this early stage in the case, dismiss counts on their face because they appear to be inconsistent, either factually or legally."[57]

Therefore, the Court finds Plaintiff's amended complaint contains sufficient factual allegations to satisfy Rule 9(b) and survive a motion for judgment on the pleadings as the allegations adequately establish Newbrey's fraudulent intent could be imputed to Debtor.

---

[56] *Comeau v. Rupp*, 810 F. Supp. 1127, 1139–40 (D. Kan. 1992) ("[T]he exception to the general rule of respondeat superior focuses on whether the misdeeds of the corporate employee worked to the benefit or detriment of the corporation. If the corporation's agent acted adversely to the interests of the corporation, the agent's acts are not imputed to the corporation."); *Deere & Co.*, 1994 WL 171449, at *3 (holding "where the agent has committed a fraudulent act, the fraud can be imputed to the corporation where the officer's conduct was for the benefit of the corporation") (citing *FDIC v. Gantenbein*, 811 F. Supp. 593, 596 (D. Kan. 1992)).

[57] *In re TMST, Inc.*, 610 B.R. at 825. Rule 8(d)(2) pertains to alternative claims or defenses, providing: "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). And Rule 8(d)(3) allows a party to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).

14

## 2. Badges of Fraud

Because a party rarely admits it acted with fraudulent intent, courts may consider circumstantial evidence establishing badges of fraud.[58] It is not required that every badge of fraud be present for a court to infer fraudulent intent, nor do the badges have to be given the same weight or consideration.[59] The badges of fraud are intended to be used as "'guideposts—as opposed to ineluctable factors—in a court's analysis of the totality of the circumstances'" to determine whether a party acted with actual fraudulent intent.[60]

Here, Plaintiff asserts the relevant badges of fraud are:

> (1) the lack or inadequacy of consideration;
> (3) the retention of possession, benefit or use of the property in question;
> (4) the financial condition of the party sought to be charged both before and after the transaction in question;
> (5) the existence of cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency, or treat of suits by creditors;
> (6) the general chronology of the event and transactions under inquiry;
> (7) the concealment of facts and false pretenses by the transferor;
> (9) suspicious timing of the conveyance after the debt was incurred; and
> (10) information that the transferor was insolvent as a result of the conveyance.[61]

---

[58] *In re Darter*, 2024 WL 5152577, at *14 (citing *Zubrod v. Kelsey (In re Kelsey)*, 270 B.R. 776, 782 (10th Cir. BAP 2001) and *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1338–39 (10th Cir. 1998)).

[59] *Id.* (citing cases).

[60] *Id.* (quoting *Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC)*, No. 17-12414-SAH, Adv. No. 17-01070-SAH, 2020 WL 374357, at *15 (Bankr. W.D. Okla. 2020), *aff'd* 2020 WL 5512500 (10th Cir. BAP 2020)).

[61] *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, No. 08-01789 (CGM), Adv. No. 22-01087 (CGM), 2023 WL 9010247, at *5 (Bankr. S.D.N.Y. Dec. 28, 2023) (identifying badges (1), (3), (4), (5), (6), and (7)) (quoting *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019)); *In re Kelsey*, 270 B.R. at 782 (identifying similar badges); *Collier on Bankruptcy* ¶ 548.04 (identifying others). In the context of an alleged Ponzi scheme, even absent a Ponzi scheme

15

Defendant argues the allegations in the complaint do not satisfy any badges of fraud, arguing, for example, Debtor received adequate consideration for the transfers and obligations as it used the money to purchase cars it then owned, and the transfers sought to be avoided were not concealed as they were made from Debtor's only bank account.

The Court disagrees. Looking at the alleged scheme as a whole—not individual transactions—Plaintiff's allegations are sufficient to satisfy the relevant badges of fraud at this pleading stage of the lawsuit. Plaintiff alleges particular facts showing Newbrey embezzled floorplanned vehicles from Debtor, concealed this from Debtor's owner Hybki and creditors, and incurred new floorplan loans to pay the existing loans while Newbrey sold embezzled vehicles and retained the proceeds, leaving Debtor, essentially, insolvent.[62] Taken together, Plaintiff's allegations comply with Rule 9(b) and are adequate to survive Defendant's motion.

---

presumption, some courts have found that transfers were made with the actual intent to defraud if the scheme satisfies the following badges of fraud: (1) the absence of legitimate business, (2) unrealistic promises of low risk and high returns, (3) commingling investor funds, (4) agents and brokers are paid high commission, (5) misuse of investor funds, (6) false financial statements, and (7) excessively large fees. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 528 F. Supp. 3d 219, 237–38 (S.D.N.Y. 2021) *aff'd sub nom. Picard v. JABA Assocs. LP*, 49 F.4th 170 (2d Cir. 2022)); *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1159 (9th Cir. 2024).

[62] Specifically, Plaintiff alleges Newbrey's scheme involved "moving a floorplanned vehicle from Debtor's lot to [iDeal's lot], selling the vehicle, and retaining the proceeds." Doc. 7 ¶ 42. Plaintiff also alleges Debtor (through Newbrey) bought and sold the "same vehicle [between Debtor and Newbrey's dealership] to obtain new floorplan loans from different lenders," or Debtor (through Newbrey) "obtained and paid floorplan loans on vehicles already sold by [Newbrey]." *Id.* ¶¶ 43, 44. This required Debtor "to continually increase its purchases and sales of vehicles to generate revenue" to pay the floorplans due as Debtor "neither sold … nor received any portion of the proceeds from the sale" of the embezzled floorplanned vehicles and Debtor "received no benefit or value in exchange for the floorplan obligations." *Id.* ¶¶ 39, 68, 75(b).

16

### 3. Ponzi Scheme

If there is sufficient evidence of a Ponzi scheme, the actual intent to defraud element under § 548(a)(1)(A) may be established via the Ponzi scheme presumption.[63] This presumption exists because it is presumed any transfers made in the course of a Ponzi scheme could have been made for no other purpose than to commit fraud.[64]

There is no set definition of what constitutes a Ponzi scheme, nor are all Ponzi schemes identical, but generally each scheme possesses a key commonality: "[Solicitation of] new investors whose funds are then used primarily to make distributions to earlier investors."[65] Because there is no set definition, some courts have used the following "four-factor test" to determine whether a Ponzi scheme exists: (1) deposits were made by investors; (2) the debtor conducted little to no

---

[63] *Wagner v. Pruett (In re Vaughan Co., Realtors)*, 477 B.R. 206, 218 (Bankr. D.N.M. 2012); *Hafen v. Howell*, 121 F.4th 1191, 1199–1200 (10th Cir. 2024) ("But if a creditor … can show that the debtor operated a Ponzi scheme, the law presumes the debtor's transfers were fraudulent.") (citing *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022)); *Gillman v. Russell (In re Twin Peaks Fin. Servs., Inc.)*, 519 B.R. 549, 555 (Bankr. D. Utah 2014), *aff'd sub nom.*, 562 B.R. 519 (D. Utah 2016); *Pergament v. Torac Realty, LLC (In re Diamond Fin. Co.)*, 658 B.R. 748, 771 (Bankr. E.D.N.Y. 2024); *Sec. Inv. Prot. Corp.*, 528 F. Supp. 3d at 236–37.

[64] *In re Vaughan Co., Realtors*, 477 B.R. at 218–19 (quoting *McHale v. Boulder Cap. LLC (In re The 1031 Tax Group, LLC)*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010)); *In re Twin Peaks Fin. Servs., Inc.*, 519 B.R. at 555 (quoting *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987)); *In re Diamond Fin. Co.*, 658 B.R. at 771.

[65] *In re Diamond Fin. Co.*, 658 B.R. at 766 (noting there is no set definition of a Ponzi scheme, but "it always involves a fraudulent stratagem to solicit new investors whose funds are then used primarily to make distributions to earlier investors."); *In re Petters Co., Inc.*, 495 B.R. 887, 908 (Bankr. D. Minn. 2013) (the essential characteristics of a Ponzi scheme is the "churn of money in and out, to keep early investors satisfied," to maintain the guise of a successful and stable business to keep current lenders satisfied and attract future ones); *In re Vaughan Co., Realtors*, 477 B.R. at 219 (a Ponzi scheme refers to an "investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."); *In re EPD Inv. Co., LLC*, 114 F.4th at 1156 (a Ponzi scheme is a "financial fraud that induces investment by promising high returns, usually in a short time period, where in fact no legitimate profit-making business opportunity exists.").

17

legitimate business; (3) the debtor's business produced little to no profits or earnings; and (4) previous investors were paid using funds from new investors.[66]

Defendant argues Plaintiff fails to plead facts connecting Newbrey's scheme to a typical Ponzi scheme; instead, Defendant categorizes Newbrey's scheme as a "desperate attempt to service other debt" by borrowing money from lenders he could not repay to prop up a legitimate yet struggling business, something, it notes, many debtors resort to before filing bankruptcy.[67]

To be sure, not all situations in which a struggling debtor borrows money constitute a Ponzi scheme—but here, Plaintiff has pleaded particular facts showing Newbrey's overall operation, effectuated using Debtor's ability to obtain credit, had the characteristics of one: Newbrey had to obtain new floorplan loans from lenders on Debtor's behalf to pay the backlog of prior floorplan lenders whose vehicles had been embezzled and sold by Newbrey, who retained the sales proceeds.[68] Further, although a Ponzi scheme, by definition, is insolvent as it does not generate profits to

---

[66] *In re Diamond Fin. Co.*, 658 B.R. at 766. The bankruptcy court in *In re Vaughan Co., Realtors*, discussed other potential characteristics of a typical Ponzi scheme: "(1) the debtor receives funds from investors [or lenders]; (2) investors are promised large returns for their investments; (3) initial investors are actually paid the promised returns, which attracts additional investors; (4) returns to investors are not financed through the success of the underlying business venture, if any, but are taken from principal sums received from newly attracted investors; and (5) the debtor induces investments through an illusion of paying returns to investors from legitimate business activities." 477 B.R. at 219. Further, although the four-factor test specifically addresses investors, courts hold it is immaterial to differentiate between an investor and a lender as either can be "characterized as an investor in the context of a Ponzi scheme." *In re Diamond Fin. Co., Inc.*, 658 B.R. at 767 (citing *Sec. Inv. Prot. Corp.*, 528 F. Supp. 3d at 238); *In re EPD Inv. Co., LLC*, 114 F.4th at 1161 ("There is no question that lenders can be victims of a Ponzi scheme as a matter of law.").

[67] Doc. 101 at 10.

[68] Plaintiff alleges "Newbrey's embezzlement scheme functioned similar to a classic Ponzi scheme in that, to keep the scheme going, more and more capital was always needed" to pay the backlog of floorplan loans, and Newbrey, to prevent the collapse of his scheme, "employed varying methods to generate revenue" for Debtor and "[a]t all times relevant, Newbrey knew his embezzlement scheme was unsustainable." Doc. 7 ¶¶ 29, 40, 41.

18

pay investors,[69] the inference that Newbrey's scheme was akin to a Ponzi scheme is not negated or undermined just because there were aspects of Debtor's business that were legitimate.[70]

Therefore, Plaintiff's amended complaint alleged facts stating a plausible claim that Newbrey's scheme closely resembled a Ponzi scheme such that Debtor (through Newbrey) possessed the actual intent to defraud its creditors under § 548(a)(1)(A).

### b. Count II—Constructive Fraud

Section 548(a)(1)(B) provides:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

---

[69] *Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015) ("[B]ecause Ponzi schemes are insolvent by definition, we presume that transfers from such entities involve actual intent to defraud."); *In re EPD Inv. Co., LLC*, 114 F.4th at 1160.

[70] *See Sec. Inv. Prot. Corp.*, 528 F. Supp. 3d at 240 ("[I]t is common for a business to run a legitimate business alongside a Ponzi scheme, and the presence of a legitimate business alongside a Ponzi scheme does not undermine the Ponzi scheme presumption."); *In re Diamond Fin. Co.*, 658 B.R. at 768–69 (noting "[s]everal courts have found that a Ponzi scheme existed notwithstanding claims that the existence of a legitimate business negated any finding of a Ponzi scheme" and citing cases in accord).

19

Plaintiff, to allege particular facts showing the transfers were constructively fraudulent, must establish (1) the transfers were made or obligations were incurred, (2) the transfers or obligations occurred less than two years before Debtor filed for bankruptcy, (3) the transfers or obligations were made without receiving reasonably equivalent value, and (4) the transfers were made, or obligations were incurred while Debtor was insolvent.[71]

The crux of Defendant's argument is Debtor, in making the *individual* transfers, received reasonably equivalent value because Debtor was able to purchase vehicles using the proceeds of the floorplan loans, and the transfers fall within the definition of "value" under § 548(d) as they were made in repayment of the floorplan loans, i.e., antecedent debts.

The Code does not define "reasonably equivalent value." It does, however, define "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor."[72] Although a subject transfer may fall within the definition of value, e.g., satisfying an antecedent debt, that, alone, is just one aspect of the reasonably equivalent value determination.[73] The "examination into reasonably equivalent value includes three inquiries: (1) whether value was given; (2) if value

---

[71] *Redmond v. SpiritBank (In re Brooke Corp.)*, 541 B.R. 492, 507–08 (Bankr. D. Kan. 2015).

[72] 11 U.S.C. § 548(d)(2)(A).

[73] *Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013) ("In contrast to the definition of 'value,' Congress left it to the courts to make the scope and meaning of the term "reasonably equivalent."); *see generally Solomon v. Stillwater Nat'l Bank & Tr. Co. (In re Solomon)*, 299 B.R. 626, 636–37 (10th Cir. BAP 2003) (rejecting a per se rule that a transfer securing an antecedent debt is reasonably equivalent value as a matter of law and instead holding that a court must "examine what the debtor received in exchange for the securing of an antecedent debt to determine [reasonably equivalent value].").

20

was given, whether it was given in exchange for the transfer; and (3) whether what was transferred was reasonably equivalent to what was received."[74] What constitutes reasonably equivalent value is largely a question of fact,[75] and does not "demand a precise dollar-for-dollar exchange."[76] Generally, obligations incurred solely for the benefit of a third-party are not supported by reasonably equivalent value.[77]

Plaintiff's amended complaint alleges sufficient and particular facts showing Debtor did not receive reasonably equivalent value for the transfers when the transfers are analyzed within the context of the overarching fraudulent scheme, and not, as Defendant suggests, in the context of isolated transactions. Plaintiff alleges the transfers were made in the course of Newbrey's fraudulent scheme, and it was Newbrey's other companies that ultimately received the value of the transactions—

---

[74] *In re Brooke Corp.*, 541 B.R. at 510 (quoting *LTF Real Estate Co., Inc. v. Expert S. Tulsa, LLC (In re Expert S. Tulsa, LLC)*, 522 B.R. 634, 652 (10th Cir. BAP 2014)); *see generally Weinman v. Walker (In re Adam Aircraft Indus. Inc.)*, 805 F.3d 888, 897 (10th Cir. 2015) (the reasonably equivalent value "inquiry asks 'whether the debtor has received value that is substantially comparable to the worth of the transferred property.'") (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 (2015)).

[75] *Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 510 B.R. 342, 354 (10th Cir. BAP 2014), *aff'd* 805 F.3d 888 (10th Cir. 2015) (citing *Clark v. Sec. Pac. Bus. Credit, Inc.*, 996 F.2d 237, 242 (10th Cir. 1993)).

[76] *Collier on Bankruptcy* ¶ 548.05 (citing *BFP v. Resolution Tr. Corp.*, 511 U.S. at 540 n.4).

[77] *In re Brooke Corp.*, 541 B.R. at 511 (quoting *Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings)*, 457 BR. 411, 444 (Bankr. M.D.N.C. 2011)); *PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.)*, 615 F. A'ppx 925, 928 (11th Cir. 2015) ("The general rule is that payment of or assumption of a third party's debt by an insolvent is a transfer without fair consideration and is thus fraudulent.") (quoting *Butz v. Sohigro Serv. Co. (In re Evans Potato Co. Inc.)*, 44 B.R. 191, 193 (Bankr. S.D. Ohio 1984)); *Osherow v. Nelson Hensley & Consol. Fund Mgmt, L.L.C. (In re Pace)*, 456 B.R. 253, 271 (Bankr. W.D. Tex. 2011) ("[A] payment made solely for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor.") (quoting *In re Whaley*, 229 B.R. 767, 775 (Bankr. D. Minn. 1999)). There is an exception, however, for transactions in which the debtor receives a cognizable economic benefit, either directly (e.g., receives the proceeds of a loan) or indirectly (e.g., the new obligation acts as a setoff for a separate debt), from paying or guaranteeing the obligation of the third-party. *In re Pace,* 456 B.R. at 271.

not Debtor—as a result of Newbrey causing Debtor to incur the floorplan loans to purchase vehicles that were often misappropriated by Newbrey. The respective floorplan lenders allegedly did not receive proceeds from the sale by Debtor of particular vehicles they had floorplanned, and Debtor was left responsible for repaying floorplan loans without itself having sold the vehicles tied to those loans, which left Debtor in a condition of increasing insolvency and without the legitimate means to repay the loans.[78]

These allegations are sufficient to satisfy the heightened pleading standard of Rule 9(b) to support a claim Debtor did not receive reasonably equivalent value for the transfers made and obligations incurred under § 548(a)(1)(B).

## V.  **Conclusion**

Because the Court finds Plaintiff's amended complaint contains sufficient and particular factual allegations showing plausible claims for relief, the Court denies Defendant's motion for judgment on the pleadings (Doc. 89).

It is so ordered.

###

---

[78] Specifically, Plaintiff alleges, "Each floorplan obligation corresponding to the [f]raudulent [t]ransfers … was incurred by Debtor pursuant to Newbrey's fraudulent embezzlement scheme," and "Debtor received no benefit or value in exchange for the floorplan obligations" as "Debtor neither sold … nor received any portion of the proceeds from the sales of such vehicles." Doc. 7 ¶ 75(a)-(c). Further, Plaintiff alleges the money transferred to Defendant from Debtor was not "traceable to the proceeds from the sale of the corresponding floorplanned vehicles." *Id.* ¶ 77.

22